IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. |
|  | ) ) ) ) | |
| KENNEBEC SCRAP IRON, INC., | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiff, the United States of America ("United States"), by authority of the Attorney General of the United States and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), by and through their undersigned attorneys, with respect to claims under federal law, allege as follows:

## INTRODUCTION

1. This is a civil action for injunctive relief and civil penalties brought pursuant to Sections 309(b) and (d), of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(b) and (d), against Kennebec Scrap Iron, Inc. ("KSI" or "Defendant") for failing to comply with the conditions of a permit issued to it pursuant to CWA Section 402, 33 U.S.C. § 1342.

## JURISDICTION

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355 and 33 U.S.C. § 1319(b).

3. Venue is proper in this district pursuant to 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391 and 1395, because KSI is a Maine corporation and conducts business in this District, and because a number of the violations occurred in this District.

4. Notice of the commencement of this action was given to the State of Maine in accordance with 33 U.S.C. § 1319(b).

5. Authority to bring a civil action is vested in the Attorney General of the United States pursuant to Section 506 of the CWA, 33 U.S.C. § 1356, and 28 U.S.C. §§ 516 and 519.

## DEFENDANT

6. KSI is a corporation organized and existing under the laws of Maine whose principal place of business is located at 48 Broomhandle Road, Oakland, Maine 04963 ("Oakland Facility").

7. KSI operates a scrap metal recovery and recycling operation at the Oakland Facility.

8. KSI is a person within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

## STATUTORY AND REGULATORY AUTHORITY

9. The Clean Water Act is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

10. To accomplish the objectives of the CWA, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant" by any person except in compliance with

certain Sections of the CWA, including, where applicable, a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

11. Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines the term "discharge of a pollutant" as, among other things, "any addition of any pollutant to navigable waters from any point source."

12. Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, among other things, solid waste, chemical wastes, wrecked or discarded equipment, rock, sand, and industrial waste discharged into water.

13. Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "waters of the United States."

14. "Waters of the United States" have been further defined to include, among other things: (i) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce; and (ii) tributaries of such waters. See 40 C.F.R. § 122.2.

15. Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines a "point source" as including "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel conduit, well … [or] container … from which pollutants are or may be discharged."

16. Section 402(p) of the CWA, 33 U.S.C. § 1342(p), requires a permit for storm water discharges associated with industrial activity.

17. EPA regulations define the term "storm water discharge associated with industrial activity" to include storm water discharges from facilities involved in the recycling of metals, including metal scrapyards classified as Standard Industrial Classification ("SIC") 5093. 40 C.F.R. § 122.26(b)(14)(vi).

18. CWA Section 308(a) of the CWA, 33 U.S.C. § 1318(a), authorizes the Administrator of the EPA to require the owner or operator of any point source to provide such information as the Administrator may reasonably need to carry out the objectives of the CWA, including the NPDES permit program of CWA Section 402, 33 U.S.C. § 1342.

19. Pursuant to CWA Sections 308 and 402, 33 U.S.C. §§ 1318 and 1342, EPA promulgated storm water discharge regulations at 40 C.F.R. § 122.26.

20. Pursuant to CWA Section 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B), and EPA's implementing regulations at 40 C.F.R. § 122.26, a storm water discharge associated with industrial activity is prohibited except as authorized by a NPDES permit.

21. On September 29, 1995, EPA issued a NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("1995 MSGP"). EPA re-issued the Multi-Sector General Permit for Industrial Activities on October 30, 2000 ("2000 MSGP"), 65 Fed. Reg. 64746, and again re-issued it on September 29, 2008 ("2008 MSGP") (73 Fed. Reg. 56527).

22. Section 402(b) of the CWA, 33 U.S.C. § 1342(b), provides that the EPA Administrator may authorize a state to issue NPDES permits in accordance with the requirements of the CWA.

Maine Multi-Sector General Permit

23. On January 12, 2001, the Administrator granted the State of Maine the authority to issue Maine Pollutant Discharge Elimination System ("MEPDES") permits for all areas of the State other than Indian country, pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b).

24. Section 402(p), 33 U.S.C. § 1342(p), EPA's implementing regulation 40 C.F.R. § 122.26(a)(1)(ii), and Section 9(a)(1)(ii) of the State of Maine Department of Environmental

Protection ("MEDEP") Rules concerning Applications for Waste Discharge Licenses, 06-096 C.M.R. 521(9)(a)(1)(ii), require facilities discharging stormwater "associated with industrial activity" to be authorized by a permit.

25.     40 C.F.R. § 122.26(b)(14)(vi) and Chapter 521, Section 9(b)(14)(vi) of the MEDEP Rules concerning Applications for Waste Discharge Licenses, 06-096 C.M.R. 521(9)(b)(14)(vi), specify that "storm water discharge associated with industrial activity" includes storm water discharge from facilities classified as SIC 5093 (scrap and waste materials).

26.     On October 11, 2005, MEDEP issued a MEPDES Multi-Sector General Permit for Stormwater Discharge Associated with Industrial Activity ("2005 ME MSGP"). Although the expiration date for the 2005 MEMGSP was originally set for October 11, 2010, it remained in effect until April 26, 2011, the date MEDEP issued an updated general permit ("2011 ME MSGP"). The expiration date of the 2011 ME MSGP is April 26, 2016.

27.     Under the 2005 ME MSGP and the 2011 ME MSGP, a facility discharging storm water "associated with industrial activities" is required to: submit an Notice of Intent to comply with the general permit ("NOI"); prepare and implement a Storm Water Pollution Prevention Plan ("SWPPP"); conduct inspections and monitoring; prepare reports; keep records; and train employees.

28.     The 2005 ME MSGP requires a quarterly visual examination of stormwater discharge. The samples collected for the quarterly visual examination must be collected within the first 60 minutes (but no later than 2.25 hours) of runoff or snowmelt discharge from a facility. All samples must be collected from the discharge resulting from a storm event that is greater than 0.1 inches in magnitude and that occurs at least 72 hours from a previously measureable (greater than 0.1 inch rainfall) storm event.

29.     The 2011 ME MSGP defines a "qualifying storm event" as "a storm event that is either precipitation, ice or snow melt that produces a measurable discharge at an outfall that occurs at least 72 hours from a previous measurable storm event."

30.     On information and belief, there was at least one qualifying "storm event" within the meaning of the 2005 ME MSGP and at least one "qualifying storm event" within the meaning of the 2011 Maine MSGP during each quarter that violations are alleged in this complaint.

Enforcement Authorities

31.     Under Sections 309 and 402(i) of the CWA, 33 U.S.C. §§ 1319 and 1342(i), the United States retains concurrent authority to enforce violations of state-issued CWA permits.

32.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the commencement of a civil action for appropriate relief, including a permanent or temporary injunction, against any person who violates Section 301(a) of the CWA, 33 U.S.C. §§ 1311(a), or any condition or limitation in a permit issued pursuant to the Section 402 of the CWA, 33 U.S.C. § 1342.

33.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates Section 301 of the Act, 33 U.S.C. § 1311, or violates any permit condition or limitation in a permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342, shall be subject to a civil penalty not to exceed the specified maximum penalty per day for each violation. Pursuant to Section 309(d) of the CWA and 40 C.F.R. § 19.2, the maximum daily penalty for CWA violations, at all relevant times for each violation alleged in this complaint, is $37,500.

## THE FACILITY AND OPERATIONS

34. Since April of 2009, KSI has operated the Oakland Facility.

35. At the Oakland Facility, KSI conducts scrap metal recovery and recycling operations on the site, including but not limited to, the processing of ferrous and non-ferrous metals.

36. At the Oakland Facility, KSI receives vehicles that are drained of fluids, dismantled, and crushed.

37. At the Oakland Facility, KSI receives vehicles that contain fluids and contain other components including batteries and electrical switches potentially containing mercury.

38. At the Oakland Facility, KSI drains scrap vehicles of fluids including motor oil, gasoline, anti-freeze, and hydraulic fluids.

39. At the Oakland Facility, KSI dismantles scrap vehicles including removal of batteries and electrical switches potentially containing mercury.

40. At the Oakland Facility, KSI stores scrap vehicles and other types of metal scrap on a concrete pad, directly on the ground, or in metal roll-off containers.

41. At the Oakland Facility, KSI uses or formerly used a front end loader to crush scrap cars at the site.

42. Operations at the Oakland Facility are subject to Maine permitting requirements, including ME MSGP Sector N, for metal scrapyards, SIC 5093.

43. Stockpiles of metal scrap and roll-off containers of metal components and other waste materials can contain metals, solids, and sediment.

44. Fluids that KSI drains from vehicles include metals, ethylene glycol, and total petroleum hydrocarbons ("TPH") (i.e., lubricating oils, waste oils, and hydraulic oils).

45. Vehicle refueling on-site can generate TPH and sediment.

46. Trucks and other vehicles delivering, among other things, scrap metal, junked cars, and industrial materials to the facility, or transporting processed scrap metal and industrial materials offsite use the driveway to access the facility.

47. Vehicle access for material transport onto and within the Oakland Facility generates pollutants, including, but not limited to, sediment and TPH.

48. Stormwater discharged from the Oakland Facility contains pollutants including, but not limited to, sediment, TPH, ethylene glycol, and metals, including but not limited to, aluminum, copper, iron, lead, magnesium, mercury, and zinc.

49. Stormwater from the Oakland Facility flows from at least two drainage areas and exits the site through at least two separate outfalls.

Northern Outfall

50. KSI conducts industrial activity in the drainage area encompassing the northernmost portion of the Oakland Facility ("Drainage Area #1"). Industrial activities that take place in Drainage Area #1 include scrap metal receiving and shipping; scrap metal sorting and stockpiling; roll-off container (i.e. dumpster) storage; storage of vehicles prior to being drained of fluids and removal of components such as batteries; vehicle fluid draining and battery removal; transport of vehicle fluids and batteries to a storage area; vehicle refueling; and outdoor storage of vehicles and heavy equipment.

51. Stormwater from Drainage Area #1 flows into a partially vegetated, partially rip-rap lined drainage swale that borders the northwest portion of Drainage Area #1. The swale flows into a settlement basin.

52. The outlet to the settlement basin is overlain with rip-rap.

53. Stormwater that flows through the outlet flows approximately 20 feet down a steep bank (the "Northern Outfall") into an unnamed tributary that borders the property to the north ("North Tributary"), a water of the United States.

Driveway Outfall

54. Stormwater runoff from the driveway entrance flows through swales located on the western and eastern sides of the driveway.  ("Drainage Area #2).

55. Stormwater runoff that flows down the swales on the eastern and western sides of the driveway is directed to catch basins at the base of the driveway which discharge through a pipe ("Driveway Outfall") into a second unnamed tributary ("South Tributary").

56. The South Tributary flows to the east and merges with the North Tributary before crossing under Route 23.  The North Tributary then flows into Messalonskee Stream, a perennial stream, which flows into the Kennebec River which flows into Merrymeeting Bay then into the Gulf of Maine of the Atlantic Ocean.

## GENERAL ALLEGATIONS

57. On April 10, 2009, KSI applied for coverage for discharges of stormwater associated with industrial activity at the Oakland Facility under the 2005 ME MSGP.  On April 21, 2009, ME DEP authorized KSI to discharge stormwater to Messalonskee Stream pursuant to the terms and conditions of the 2005 ME MSGP (Permit number MER05B950).

58. On May 5, 2011, KSI applied for coverage for discharge of stormwater associated with industrial activity at the Oakland Facility under the 2011 ME MSGP. On June 15, 2011, ME

9

DEP authorized KSI to discharge stormwater to Messalonskee Stream pursuant to the terms and conditions of the 2011 ME MSGP (Permit number MER05B950).

## FIRST CLAIM FOR RELIEF
**(Permit Violations for Insufficient SWPPP and Failure to Update the SWPPP)**

59. Plaintiff realleges and incorporates by reference Paragraphs 1 through 58.

60. The 2005 ME MSGP (Part IV.F.) and the 2011 ME MSGP (Part V.D.) requires KSI to prepare and implement a SWPPP containing specific elements.  At relevant times between October 22, 2009 through June 30, 2015, KSI's SWPPP was insufficient as follows:

   a. Deficient site map. The site map lacked required features (e.g. locations of scrap storage and locations of structural BMPs), in violation of the 2005 ME MSGP (Part IV.F.2.b. and Appendix N.4.a.) and the 2011 ME MSGP (Part V.D.3. and Appendix N.D.1.);

   b. Incomplete summary of pollutant sources.  The SWPPP did not adequately list all pollutant sources (e.g. metals, material stockpiling, wet vehicle storage, and vehicle crushing), in violation of the 2005 ME MSGP (Part IV.F.4.) and of the 2011 ME MSGP (Part V.D.4.);

   c. Failure to clearly identify areas where potential spills and leaks may occur along with accompanying drainage points, in violation of the 2005 ME MSGP (Part IV.F.5.) and the 2011 ME MSGP (Part V.D.5.); and

   d. Failure to adequately describe and implement a preventative maintenance program providing for timely inspection and maintenance of stormwater management devices (e.g., cleaning of oil water separators and catch basins), and good-housekeeping best management practices ("BMPs") (e.g., sweeping and

proper material containment), in violation of the 2005 ME MSGP (Part IV.F.7.b.i.) and of the 2011 ME MSGP (Part V.D.9.a.).

61. The 2005 ME MSGP (Part IV.L.) and the 2011 ME MSGP (Part V.K.) require KSI to maintain an updated SWPPP.

62. KSI failed to regularly update the SWPPP following changes at the facility (e.g. physical and/or process changes), in violation of the 2005 ME MSGP and the 2011 ME MSGP.

63. KSI failed to comply with the 2005 ME MSGP and the 2011 ME MSGP, as described in Paragraphs 60 through 62.

64. As alleged in Paragraphs 31-33, KSI is liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

## SECOND CLAIM FOR RELIEF
### (Permit Violations for Failure to Maintain BMPs in Effective Operating Condition)

65. Plaintiff realleges and incorporates by reference Paragraphs 1 through 64.

66. The 2005 ME MSGP (Part IV.G.) and the 2011 ME MSGP (Part V.E.) require that "All BMPs identified in the SWPPP must be maintained in effective operating condition."

67. On April 19, 2013, an EPA inspector observed that haybales placed alongside the eastern side of the driveway and at the Driveway Outfall were not staked and were disintegrating.

68. On April 19, 2013, an EPA inspector observed that the catchbasin drain on the western side of the driveway is raised above the surface so as to be of little or no utility as a stormwater management device.

69. On December 16, 2014, an EPA inspector observed a used oil-absorbent boom saturated with oil and disintegrating in the spill pond.

70. The 2005 ME MSGP (Part IV.F.7.b.i. and Appendix N.4.b.2. and 5.) and the 2011 ME MSGP (Part V.C.1. and Appendix N.D.4.) require that permittees "minimize exposure of the manufacturing process, and material or product storage areas to stormwater (where practicable) by locating industrial activities and materials inside or by protecting them with storm resistant coverings."

71. On April 19, 2013, an EPA inspector observed three uncovered trailers containing motor coils to the west of the processing building. The trailers were located in close proximity to a drainage swale to the Northern Outfall.

72. The 2005 ME MSGP (Part IV.F.7.b.i. and Appendix N.4.b.5) and the 2011 ME MSGP 2011 (Part V.C.2. and Appendix N.D.4) require that permittees "perform good housekeeping procedures, and keep all exposed areas that are potential sources of pollutants clean and orderly."

73. On December 16, 2014, an EPA inspector observed that sediments were migrating off-site in the flood plain of the North Tributary to the east of the site in the absence of a silt fence or haybales.

74. KSI failed to comply with the 2005 ME MSGP and the 2011 ME MSGP as described in Paragraphs 66 through 73.

75. As alleged in Paragraphs 31-33, KSI is liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

### THIRD CLAIM FOR RELIEF
### (Permit Violations for Failure to Conduct or Properly Conduct Benchmark Monitoring)

76. Plaintiff realleges and incorporates by reference Paragraphs 1 through 75.

77. The 2011 ME MSGP (Part VI.G. and Appendix N., Part F and Part VIII.L.4) requires that permittees conduct quarterly benchmark monitoring for three parameters, Total Suspended Solids ("TSS"), Total Petroleum Hydrocarbons ("TPH"), and pH.

78. KSI failed to conduct benchmark monitoring for the Northern Outfall, at least in each of the quarters specified in Appendix 1 to this complaint.

79. KSI failed to properly conduct benchmark monitoring for the Northern Outfall, at least in each of the quarters specified in Appendix 1 to this complaint, as described therein.

80. KSI failed to conduct benchmark monitoring for the Driveway Outfall, at least in each of the quarters specified in Appendix 1 to this complaint.

81. KSI failed to properly conduct benchmark monitoring for the Driveway Outfall, at least in each of the quarters specified in Appendix 1 to this complaint, as described therein.

82. KSI failed to properly conduct benchmark monitoring as required by 2011 ME MSGP, as described in Paragraphs 77 through 81 and Appendix 1 to this complaint.

83. As alleged in Paragraphs 31-33, KSI is liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

### FOURTH CLAIM FOR RELIEF
**(Permit Violations for Failure to Conduct or Properly Conduct Visual Monitoring)**

84. Plaintiff realleges and incorporates by reference Paragraphs 1 through 83.

85. The 2005 ME MSGP (Part V.A.1.) and the 2011 ME MSGP (Part VI.B.) requires that permittees conduct quarterly visual monitoring of stormwater discharges.

86. KSI failed to conduct quarterly visual monitoring for the Northern Outfall, at least in each of the quarters specified in Appendix 2 to this complaint.

87. KSI failed to properly conduct quarterly visual monitoring of stormwater discharges for the Northern Outfall, at least in each of the quarters specified in Appendix 2 to this complaint.

88. KSI failed to conduct quarterly visual monitoring for the Driveway Outfall, at least in each of the quarters specified in Appendix 2 to this complaint.

89. KSI failed to properly conduct quarterly visual monitoring of stormwater discharges for the Driveway Outfall, at least in each of the quarters specified in Appendix 2 to this complaint.

90. KSI failed to conduct quarterly visual monitoring as required by the 2005 ME and the 2011 ME MSGP as described in Paragraphs 85 through 89 and Appendix 2 to this complaint.

91. As alleged in Paragraphs 31-33, KSI is liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

## FIFTH CLAIM FOR RELIEF
**(Permit Violations for Failure to Properly Conduct Quarterly Site Evaluations)**

92. Plaintiff realleges and incorporates by reference Paragraphs 1 through 91.

93. The 2011 ME MSGP (Part V.I.) requires that permittees conduct Quarterly Site Inspections, also called "Site Compliance Evaluations" ("SCE"). This part of the ME MSGP provides that at least one SCE per year must be conducted within 24 hours of a qualifying storm event and there must be at least 60 days between each SCE.

94. KSI conducted the 2012 third and fourth quarter SCEs less than 60 days apart.

95. KSI conducted the 2013 first and second quarter SCEs less than 60 days apart.

96. KSI failed to perform SCEs as required by the 2011 ME MSGP as described in Paragraphs 93 through 95.

97. As alleged in Paragraphs 31-33, KSI is liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

### SIXTH CLAIM FOR RELIEF
**(Permit Violations for Failure to Properly Conduct Employee Training)**

98. Plaintiff realleges and incorporates by reference Paragraphs 1 through 97.

99. The 2005 ME MSGP (Part IV.F.7.b.i) and the 2011 ME MSGP (Parts V.D.9.a. and V.J.5) require that permittees provide annual training to all employees that work in areas where industrial material or activities are exposed to storm water or that are responsible for implementing activities identified in the SWPPP, and that such training be comprised of specific prescribed components set forth in those provisions.

100. At relevant times, upon information and belief, KSI employed up to five people that worked in areas where industrial material or activities are exposed to storm water or that are responsible for implementing activities identified in the SWPPP.

101. On information and belief, training records for at least 2011 and 2012 reflect that not all relevant employees received training.

102. KSI failed to comply with training requirements set forth in the 2005 ME MSGP and the 2011 ME MSGP as described in Paragraphs 99 through 101.

103. As alleged in Paragraphs 31-33, KSI is liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

## **RELIEF SOUGHT**

Wherefore, Plaintiff, the United States of America, respectfully requests that the Court grant the following relief:

1. Order Defendants to comply with all applicable requirements of the Clean Water Act and its implementing regulations including the 2011 ME MSGP and any subsequent permits issued to Defendants.

2. Order Defendant to pay civil penalties not to exceed $37,500 per day for each violation;

3. Award the United States all costs and disbursements of this action; and

4. Grant such other relief as the Court deems just and proper.

                                              Respectfully submitted,

                                              JOHN C. CRUDEN
                                              Assistant Attorney General
                                              Environment and Natural Resources Division

Dated: 4/1/16                             /s/ Bradley L. Levine
                                              BRADLEY L. LEVINE
                                              Environmental Enforcement Section
                                              Environment and Natural Resources Division
                                              U.S. Department of Justice
                                              P.O. Box 7611
                                              Ben Franklin Station
                                              Washington, D.C.  20044-7611
                                              (202) 514-1513
                                              bradley.levine@usdoj.gov


                                              THOMAS E. DELAHANTY II
                                              United States Attorney for the District of Maine

                                              JOHN OSBORN
                                              United States Attorney's Office
                                              Chief, Civil Division

Of Counsel:

Kathleen E. Woodward
Senior Enforcement Counsel
U.S. Environmental Protection Agency, Region 1
5 Post Office Squire
Boston, MA 02109